FILED
CHARLOTTE, NC

JUN 2 2 2022

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| **UNITED STATES OF AMERICA and STATE OF NORTH CAROLINA** *ex rel.* **SCOTT A. RAMMING, M.D. and ALLEN LALOR, M.D.,**<br><br>     **Relators/Plaintiffs,**<br><br>**v.**<br><br>**HCA HEALTHCARE, INC., HCA MANAGEMENT SERVICES, LP, HCA, INC., MH MASTER HOLDINGS, LLLP, MH HOSPITAL MANAGER, LLC, TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,**<br><br>     **Defendants.** | 3:22 cv 278 - MOC<br><br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2), N.C.G.S. § 1-608(b)(2) and LCvR 6.1(b).** |

# <u>DO NOT PLACE IN ECF/PACER</u>

1

CHD 071790

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NORTH CAROLINA *ex rel.* SCOTT A. RAMMING, M.D. and ALLEN LALOR, M.D., <br><br>     **Relators/Plaintiffs,** <br><br> **v.** <br><br> **HCA HEALTHCARE, INC., HCA MANAGEMENT SERVICES, LP, HCA, INC., MH MASTER HOLDINGS, LLLP, MH HOSPITAL MANAGER, LLC, TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,** <br><br>     **Defendants.** | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2), N.C.G.S. § 1-608(b)(2) and LCvR 6.1(b).** |

### FALSE CLAIMS ACT COMPLAINT
### FILED *IN CAMERA* UNDER SEAL
### (*See* 31 U.S.C. § 3730(b)(2); N.C.G.S. § 1-608)

Relators/Plaintiffs Scott A. Ramming, M.D., and Allen Lalor, M.D., pursuant to LCvR 6.1(b) (allowing filing under seal pursuant to statute), hereby bring this action for the benefit of the United States of America, acting on behalf of the U.S. Department of Health and Human Services and the Centers for Medicare & Medicaid Services ("CMS"), and for the benefit of the State of North Carolina, acting on behalf of the North Carolina Department of Health and Human Services ("NC DHHS") and the North Carolina Medicaid Division of Health Benefits ("NC Medicaid"). Relators, though their undersigned counsel, hereby file under seal this Complaint against Defendant HCA Healthcare, Inc., and its affiliates (collectively "HCA"), and Defendant Team Health Holdings, Inc., and its affiliates (collectively "Team Health" or "TH"), and allege,

of personal knowledge as to each of his own observations and actions, and on information and belief as to all else, as follows:

## I.    NATURE OF THE CLAIM.

1.      Relators bring this action to recover, for the benefit of the federal and state governmental Plaintiffs, and for the benefit of necessary recoupment to the Medicare program, any and all reimbursement paid by Medicare and NC Medicaid to Defendants as a result of systematic fraudulent overbilling of payers for Emergency Department ("ED") medical care, services, treatment and supplies, during the pertinent times and dating from within the statute of limitations period.[1]  Relator Ramming is an active board-certified ED physician working today in the Mission hospital system and the former assistant director of the Mission Hospital Asheville ED.   Relator Ramming per his Disclosure Summary provides detail on the false claims and specific examples of the same.  Relator Lalor is also a board-certified ED physician who has worked for years in the Mission hospital system.  Relator Lalor per his Disclosure Summary likewise provides detail with regard to certain of the key documents and practices, as well.

2.      HCA is the largest private hospital chain in the country.  TH is the largest for-profit medical staffing company in the country.  Both companies are no strangers to litigation; both have been sued previously for other varieties of overbilling and misconduct actionable under the False Claims Act.[2]

---

[1] *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S.Ct. 1507 (2019) (describing application of six-year statute of limitations on claims filed by qui tam relators; citing 31 U.S.C. § 3731).

[2] *E.g.*, US DOJ Press Release, June 26, 2003, Largest Health Care Fraud Case in U.S. History Settled, HCA Investigation Nets Record Total of $1.7 Billion ("HCA Inc. … has agreed to pay the United States $631 million in civil penalties and damages arising from false claims the government alleged it submitted to Medicare and other federal health programs, the Justice Department announced today."),  https://www.justice.gov/archive/opa/pr/2003/June/03_civ_386.htm  (last accessed 3/30/22); US DOJ Press Release, Sept. 19, 2012, Hospital Chain HCA Inc. Pays $16.5 Million to Settle False Claims Act Allegations Regarding Chattanooga, Tenn., Hospital Allegedly Provided Financial Benefits to Doctors' Group That Referred Patients to HCA-owned Facilities,

3.     During the pertinent times, starting in 2019, HCA owned and controlled the

Mission Hospital system.  Starting in or about April 2020, TH has provided medical staffing for

HCA at the Mission system, including in all of the six system hospital emergency departments.

Those include one of the biggest and busiest emergency departments in the nation: the HCA

Mission Hospital Emergency Department located in Asheville, NC.

4.     Relator Ramming and Relator Lalor are each longtime, experienced emergency

medicine physicians who had worked in the Mission Hospital ED for years when HCA assumed

control over Mission Hospital in January 2019 and TH assumed control over ED medical staffing

in April 2020.

5.     Unfortunately, the combined effect of the superimposition of the new HCA and TH

for-profit corporate practices has been to intentionally overbill *inter alia* public payers for wasteful

and medically unnecessary services and supplies, including:

> a. ***Extra blood draws, urinalysis, other samples and tests, laboratory analyses of***
> ***samples, metabolic panels*** – these are ordered on a routine basis.  For numerous
> patients, these services are wasteful and medically unnecessary.  Adding these care
> items onto the chart for such patients at the Mission Asheville ED serves only to
> pad the bill for emergency department services with high-margin, high-volume
> add-ons, while clogging up the ED and wasting practitioner time.  Specific
> examples of these practices are provided below, based on private information not

---

available at https://www.justice.gov/opa/pr/hospital-chain-hca-inc-pays-165-million-settle-false-
claims-act-allegations-regarding (last accessed 3/30/22); *United States ex rel. Hernandez v. Team
Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446
(E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False
Claims Act, alleging upcoding and overbilling fraud); *Celtic Ins. Co. v. Team Health Holdings,
Inc.*, No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (see Doc. 1, complaint filed Dec. 10, 2020 ¶¶
8-17 alleging *inter alia* systematic upcoding/overbilling); *United Healthcare Servs., Inc. v. Team
Health Holdings, Inc.*, No. 3:21-cv-00364 (E.D. Tenn.) (alleging that TeamHealth engaged in
upcoding of health insurance claims); *United States ex rel. Oughatiyan v. IPC the Hospitalist Co.,
Inc.*, No. 09-C-5418, 2015 U.S. Dist. LEXIS 19066, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015)
(denying in part motion to dismiss FCA claim of TH hospitalist overbilling); *U.S. ex. rel.
Mamalakis vs. Anesthetix Mgmt. LLC*, 2021 U.S. App. LEXIS 36193, 2021 WL 5818476 (Disc.
8, 2021) (involving TH anesthesiologist overbilling).

previously disclosed. Furthermore, additional examples can readily be identified if the relevant provider files were audited.

b. ***Extra CT scans and X-rays having the exact same effect*** – they are unnecessary and redundant, but Defendants use a system that is designed to cause numerous unnecessary orders of these scans and imaging technologies. Furthermore, each time an unnecessary CT scan is ordered, not only does that cause another add-on to appear on the medical bill, but it also may trigger automatic CPT level 4 code billing or otherwise lead to more expensive claim categorization for Medicare reimbursement purposes.

c. ***Extra "Code Trauma," "Trauma Alert," and similar ("Geri Trauma," "Code Sepsis") designations*** that are neither necessary nor required but under HCA's and TH's policies and procedures are triggered excessively often. Each time Code Trauma or Trauma Alert is designated, it presumptively becomes a bill for a higher charge than otherwise.

d. Exacerbating matters, Defendants pressure medical staff to obey what they call "performance metrics" which in reality are policies and procedures that pit staff against each other and that are meant to try to force doctors into short cookie-cutter time quotas with patients.

e. ***Redundant ED charges as between transferor and transferee ED*** -- Defendants have use transfer criteria that can lead to the overloading of the Asheville ED with patients. In addition, or in the alternative, patients a) incur ED charges at the ED of the original, transferor hospital; and b) also incur redundant ED charges at the ED of the second, transferee hospital – typically HCA Mission Hospital Asheville.

f. All of this conduct not only causes overcharges and overbilling, but also, and as importantly from Relators' perspective, causes deterioration of the service experience both for patients and for healthcare workers alike. The deterioration in the quality of the service environment is related to HCA's monopolistic conduct, for which there is separate litigation pending.[3]

g. Since the time that HCA and TH took over, rampant cost-cutting has led to reduced and demoralized staff. As Dr. Ramming describes, on any given day one may see some blood on the floor, or overflowing trash containers, or overstressed nurses. This loss of quality is caused by HCA's monopoly. It knows that anyone who goes to the Asheville ED must go there, has no other choice, and must endure any presence of understaffing, overly stressed personnel, unpleasant overcrowding, trash on the floor or other such issues.

---

[3] *Davis v. HCA Healthcare*, No. 21-cvs-03276 (Buncombe County Superior; Business Court designation); *City of Brevard, North Carolina v. HCA Healthcare, Inc.,* No. 1:22-cv-00114 (W.D.N.C.).

5

6.      The business model for a modern for-profit ED is a volume business.  HCA states that in recent years it has had over 90,000 patients visit the Mission ED on an annual basis.  Labor is the largest cost category for HCA and TH.  In order to win the right to staff the six EDs in the Mission system, TH on information and belief touted its reduced labor costs and aggressive coding and billing department, HCFS.

7.      TH seeks to require its doctors to see as many patients as possible, during each shift of work, because this increases the amount of revenues.  An ED physician who works eight hours a shift and sees 20 patients a shift makes more money for Team Health and HCA than a physician who works eight hours and sees 10 patients.  To pressure physicians to see more patients per shift, Defendants use "performance metrics."  These are humiliating, zero-sum rankings of physicians against each other, which are accompanied by incessant "encouragements" to reduce the average length of service (abbreviated LOS) to fewer minutes, and generic unilateral written employment contracts that make a payment bonus contingent on compliance with the metrics.

8.      Defendants also intentionally under their corporate business model deploy a non-physician practitioner to initiate contact with and meet incoming waiting room patients within five minutes or some other target time.[4]  This non-physician practitioner may order unnecessary

---

[4] As discussed further in the Mitchell Li Expert Summary, this target time helps to create the illusion of improving another metric, namely, "Left Without Being Seen" or LWBS. Essentially, this is saying that the ED fulfilled EMTALA with these patients since they were "seen" and had an official, formal medical screening exam (MSE) in the form of the brief visit with the non-physician practitioner – with no physician involvement. The Emergency Medical Treatment and Labor Act (EMTALA) is a federal law that was originally enacted by Congress in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (42 U.S.C. § 1395dd). Among other things, EMTALA requires that any individual who comes and requests must receive an MSE to determine whether an emergency medical condition exists. The standard for the complete and reasonable performance of an MSE is not meaningful nor is reimbursement for any MSE properly and validly earned when performed too rapidly, by a non-physician practitioner, and when directed by Standard Operating Procedures (SOP's) and protocols directing ordering of labs and imaging and promulgated by non-physicians at TH and/or HCA. Due to this distorted

services and items. Much in the same way in which notorious "packing and stuffing" and "add-on" schemes have worked in consumer sales in other industries,[5] Defendants by their policies, procedures and operational systems, have caused numerous medically unnecessary lab and scan charges to be added into the hundreds of thousands[6] of separate patient encounters that occur at the Mission Asheville ER on a yearly basis.

9.     The unnecessary charges and waste were and are not necessary. This is evident by comparing items such as the number of trauma designations, before and after when HCA and TH took control over the Mission Asheville ED. There has been a significant increase in Code Trauma designations, billing and charges for ED patients. This is demonstrated by a comparison of the empirical data from the years of nonprofit community-based operation, as a nonprofit, compared to the data from more recent years.

10.     Because both the HCA and TH Defendants use materially uniform and common operational systems, policies and procedures, on a site-by-site basis, Relators are informed and believe, and therefore allege, that similar conduct is also occurring at other large-sized HCA and TH emergency department locations nationally.

11.     As is detailed below, the Relators have personally observed the imposition of new operational policies and procedures by TH and HCA and has observed the effect of those policies

---

behavior for metrics compliance, the "LWBS" rate goes down but costs go up and patients still often leave the ED because they never got put into a room and truly examined by a physician (or adequately examined by a non-physician practitioner, under the circumstances). Since its enactment in 1986, EMTALA has remained an unfunded mandate.

[5] *E.g., Mills v. Hendrick Automotive Group*, No. 04-cvs-2301 (Union County); *Clark v. Alan Vester Auto Group, Inc.*, No. 06-CVS-141 (Vance County).

[6] With annual Mission Asheville ED visits said to range between 90,000 and 100,000, the average per day at 90,000 patients per year would equal 246 patients each day, or over 1,700 per week.

7

and procedures on ED patient services and billing. This is nonpublic information. What is detailed in Relators' Summaries, filed herewith, includes facts regarding:

    a. How Relators received, retained and compiled the various key documents relevant hereto, including the emails containing "service line minutes;"

    b. How Relators observed the changes to the business practices and policies of the Mission Hospital system over the pertinent time, leading to the ongoing overcharges and false claims;

    c. Specific examples of false claims founded upon the over-ordering of medically unnecessary and wasteful lab items, samples, tests, blood draws, urinalysis, laboratory analyses, metabolic panels, or related items;

    d. Specific examples of false claims founded upon the over-ordering of numerous medically unnecessary and wasteful scans including x-rays and CT scans;

    e. That during the pertinent tines, Defendants caused the over-designation of cases as either being "Code Trauma" or "Trauma Alert," "Code Sepsis" or "Geri Trauma," when it was not medically necessary; specific examples of improperly called Code Traumas are provided (see Ramming Summary);

    f. That there was overbilling caused by the overcrowding of the Asheville ED by needless transfers to the ED from other hospitals, triggering redundant lab and scan orders; and

    g. How Defendants caused the imposition on physicians and midlevel providers of certain excessive and overburdening "metrics," performance incentives, instructions and admonitions that have reduced the individual medical professional's ability to spend time with the patient and have encouraged ordering of unnecessary or redundant labs and scans and unjustified Code Traumas and Trauma Alerts.

12. These practices have caused overbilling of Medicare and other payors. The facts resemble prior schemes found to be actionable under the FCA. Furthermore, given the size of the Asheville ED and its high patient volume of more than 90,000 patients per year, and the prevalence of the practices as documented by the Relators, the economic harm to the Medicare program has likely been substantial, from the Asheville ED-derived billing alone. However, the practices are likely occurring at other EDs throughout the HCA and TH systems.

8

13. Accordingly, Relators allege claims under the federal False Claims Act, 31 U.S.C. §§ 3729 to 3733 ("FCA") and the North Carolina False Claims Act, N.C.G.S. §§ 1-605 to 1-618 ("NC FCA").

## II.    JURISDICTION AND VENUE.

14. This Court has subject matter jurisdiction under 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction over state-law causes of action under 28 U.S.C. § 1367(a).

15. The Court may exercise personal jurisdiction over the Defendants because they reside or transact business in, own facilities or properties in, committed proscribed acts in, or were directly and materially involved in owning, operating and managing relevant operations and facilities in this District during the pertinent times.

16. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as the place where one or more of the Defendants resides and where a substantial part of the events or omissions giving rise to the claims occurred.

17. The Complaint has been filed within the period prescribed by 31 U.S.C. §§ 3730 and 3731.

## III.    STATUTORY BACKGROUND.

### A.    FCA.

18. Under the FCA, any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or who conspires to commit a violation, is liable to the United States Government for a civil penalty plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §§ 3729(a)(1)(A) & (B).

19.     "Knowingly" is defined to include acting in reckless disregard or deliberate indifference of the truth or falsity of information, as well as including actual knowledge of such falsity. *See id.* § 3729(b)(1). Further, "no proof of specific intent to defraud" is required to establish liability under the FCA. *Id.*

20.     For purposes of Section 3729(a)(1)(B), the FCA defines "material" as "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

21.     Under 31 U.S.C. § 3730(b)(1), a person may bring a civil action for a violation of section 3729 for the person and for the United States Government.

22.     Under 31 U.S.C. § 3730(b)(2), a copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Fed. R. Civ. P. 4(d)(4). The complaint shall be filed *in camera*, shall remain under seal for at least 60 days, and shall not be served on the defendants until the Court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives the complaint and the material evidence. Relator has complied with these requisites.

23.     Under 31 U.S.C. § 3730(b)(3) & (4), the Government may, for good cause shown, move the Court for extensions of the time during which the complaint remains under seal. Ultimately the Government may elect to proceed with the action, in which case the action shall be conducted by it; or notify the Court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct it.

**B.     NC FCA.**

24.     Pursuant to N.C.G.S. § 1-608, a copy of the complaint and written disclosure of substantially all material evidence and information Relator possesses is being served on the North Carolina Attorney General.

25.     For purposes of the NC FCA claim, the complaint shall remain under seal for at least 120 days and shall not be served on the defendants until the Court so orders. The State may elect to intervene and proceed with the action within 120 days after it receives both the complaint and material information.

## IV.    PARTIES.

**A.     Relators.**

26.     Relator **Scott A. Ramming, M.D.** is a citizen and resident of North Carolina. Relator Ramming has entered into a written contract with a local medical practice entity that is owned or controlled by Team Health. Relator began working at the Mission Hospital ED facility in Asheville over 20 years ago, starting back in 1998. He has worked since then both in the Asheville ED and in one or more of the five Mission EDs for the satellite hospitals in the region. He continued working in the relevant EDs both after the HCA acquisition in 2019 and the TH involvement in 2020.

27.     Relator **Allen Lalor, M.D.** is a citizen and resident of North Carolina. Relator has entered into a written contract with a local medical practice entity that is owned or controlled by Team Health. Relator began working at the Mission Hospital ED facility in Asheville over 25 years ago, starting back in 1994 and has worked since then both in the Asheville ED and in most of the Mission EDs for the satellite hospitals in the region. He continued working in the relevant EDs both after the HCA acquisition in 2019 and the TH involvement in 2020.

28.     Since on or about April 15, 2020, Team Health has owned and controlled the local practice group entity with whom Relators have each had a contract to provide professional services at the relevant hospital EDs.

29.     Plaintiff the United States brings this action by and through Relators, who sue for the benefit of the United States of America, which through the U.S. Department of Health and Human Services and CMS has reimbursed Defendants as alleged herein, and for the benefit of the State of North Carolina, which through NC DHHS and the North Carolina Medicaid Division of Health Benefits has reimbursed Defendants.

30.     There has been no public disclosure within the meaning of 31 U.S.C. § 3730(e) of the material facts alleged in this Complaint. Relators are the original source of the information on which the material allegations herein are based, they have direct and independent knowledge of such information, and they have voluntarily disclosed such information to the government. Additionally, Relators have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without their knowledge.

**B.      Defendants.**

31.     Defendant **Team Health Holdings, Inc.** is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. For jurisdictional purposes it is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312. Team Health Holdings is the ultimate parent company for the TeamHealth organization. Upon information and belief, Team Health Holdings was directly involved in promulgating and implementing the unlawful policies and practices alleged

12

herein, and/or, is otherwise directly legally responsible for the conduct alleged herein, in addition to the responsibility shared by any other named Defendant.

32.     Defendant **Ameriteam Services, LLC** is a Tennessee limited liability company. Its sole member is Team Finance LLC, whose sole member is Team Health Holdings. On information and belief, Ameriteam employs executive officers of TeamHealth, issues policies that govern all TeamHealth entities in conjunction with Team Health Holdings and provides operational direction and administrative support to TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. Ameriteam is a citizen of Delaware and Tennessee.  It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

33.     Defendant **HCFS Health Care Financial Services, LLC** is a Florida limited liability company with a principal office situated in Knoxville, Tennessee.  It may be served at its principal office address at 265 Brookview Centre Way, Suite 400, ATTN: Legal Dept., Knoxville, TN 37919-4049; or via its registered agent, Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh NC 27608.  On information and belief, the sole member of HCFS is Team Radiology, LLC, the sole member of Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings. HCFS provides billing, coding, and collection services for the Team Health enterprise.

34.     Nonparty Emergency Coverage Corporation ("ECC") is a business entity on information and belief formed and organized under Tennessee law.  It has an office address at 1431 Centerpoint Drive, Suite 100, Knoxville TN 37932.  This entity is ultimately owned by Team Health Holdings, Inc. It may be served at its addresses above or c/o its registered agent,

Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608. ECC is the local practice entity with which Relators today have contracts.

35.     ECC is one of over 100 local practice entities which are nominally separate and independent from Team Health. By setting up and controlling these local practice group entities, TeamHealth seeks to sidestep "corporate practice of medicine" laws and retain relevant control.

36.     Team Health itself is owned by a large private equity firm, Blackstone, which acquired the enterprise in 2017 for $6.1 billion. Team Health among other things provides ED staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and nominally independent entities and contractors, which operate in nearly all states and which TH refers to collectively as the "Team Health System." Team Health designed the complex structure of its system to circumvent state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, aka, the corporate practice of medicine.

37.     Defendant **HCA Healthcare, Inc.** is a Delaware corporation with its principal place of business in Nashville, Tennessee. It may be served with process through its principal office address of One Park Plaza, Nashville TN 37203, or through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. HCA Healthcare, Inc. is the ultimate parent company of the HCA enterprise. It is publicly held and listed with the Securities and Exchange Commission ("SEC").

38.     Defendant **HCA Management Services, LP** is a Delaware limited partnership with its principal place of business in Nashville, Tennessee. It may be served with process through its principal office address of One Park Plaza, Nashville TN 37203, or through its North Carolina registered agent, CT Corporation System, 160 Mine Lake Court Suite 200, Raleigh, NC 27601.

14

HCA Management Services, LP was formed in 1999. It applied for a certificate of authority to do business in North Carolina on December 28, 2005. It is registered to do business in North Carolina. It is listed on the HCA Healthcare website[7] as being the entity responsible for that website.

39. Defendant **HCA, Inc.** is a Delaware corporation with its principal place of business in Nashville, Tennessee. It may be served with process through its principal office address of One Park Plaza, Nashville TN 37203. On information and belief, HCA, Inc. is the plan sponsor of a benefit plan for numerous employees associated with the North Carolina Division of HCA Healthcare, Inc. It has been a party to prior proceedings challenging various aspects of HCA's business practices. *E.g.,* US DOJ press release dated June 26, 2003.

40. Defendant **MH Master Holdings, LLLP** is a Delaware limited liability limited partnership. It has a principal place of business in Nashville, Tennessee. It may be served with process at its registered office address, c/o CT Corporation System, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615, or, at its principal office at One Park Plaza, Nashville, TN 37203.

41. MH Master Holdings, LLLP is listed as the buyer of the Mission Hospital System pursuant to an Asset Purchase Agreement dated 2018 APA and amended in 2019. It purchased the Mission system assets via those agreements and is the current owner of the Mission system.

42. MH Master Holdings, LLLP applied for a certificate of authority to do business in North Carolina on August 23, 2018. It filed its most recent annual report with the North Carolina Secretary of State, Department of Corporations ("NC SOS"), on or about April 6, 2021, describing itself as being engaged in the "healthcare related business."

43. MH Master Holdings, LLLP's general partner is MH Hospital Manager LLC. MH Master Holdings, LLLP is a 99% limited partner in MH Mission Hospital, LLLP. Under the 2018

---

[7] https://hcahealthcare.com.

APA and 2019 Amended APA, MH Master Holdings, LLLP may do business under brand names including "Mission Health," "Mission Health System" and the "HCA" brand.

44.     Defendant, **MH Hospital Manager, LLC,** is a Delaware limited liability company with a principal place of business in Tennessee.  It may be served with process c/o its registered agent, CT Corporation System, 160 Mine Lake Court Suite 200, Raleigh NC 27615, or, at its principal office at One Park Plaza, Nashville, TN 37203.

45.     MH Hospital Manager, LLC applied for a certificate of authority to do business in North Carolina on August 22, 2018.  Its annual report dated April 6, 2021 describes the nature of its business as "healthcare related business."

46.     MH Hospital Manager uses the assumed business name, "North Carolina Division," pursuant to an assumed name certificate dated April 22, 2019 filed with the Buncombe County Register of Deeds.  It described the counties where the assumed business name will be used to engage in business as "All 100 North Carolina counties."

47.     All Defendants herein who are corporate entities, at all times material acted by and through their agents, members, business managers or servants, who were acting in the course and scope of their duties, authority and agency actual or apparent.

48.     On information and belief, the HCA and TH Defendants, acting jointly and severally, and acting directly or through intermediate entities, owned, operated, managed and controlled the relevant healthcare functions, services, coding and billing with regard to the ED medical services at issue herein at the HCA Mission ED at the Asheville hospital and the other five smaller EDs, at all relevant times.  Each Defendant was directly and personally involved in the pertinent management and control activities and as such, each is jointly and severally liable with regard to the conduct described herein.

49.     In addition, or in the alternative, during the pertinent times, Defendants civilly conspired and acted in concert in making the relevant express and implied false certifications to the United States and the State of North Carolina so as to procure payment of Medicare and Medicaid reimbursement monies.

## V.     FACTUAL BACKGROUND.

### A.     Medicare coverage.

50.     Medicare is a federally operated health insurance program administered by CMS, benefitting individuals 65 and older and the disabled. *See* 42 U.S.C. § 1395c *et seq.*

51.     The Medicare Program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care. Under Medicare Part A, CMS reimburses institutional healthcare providers a predetermined, fixed amount under a prospective payment system ("PPS").[8] Specifically, SNFs and other healthcare providers submit claims to CMS for medical services rendered and CMS in turn pays the providers for those services based on payment rates established by the government.

52.     Medicare Part B provides outpatient medical coverage.  Under the outpatient prospective payment system ("OPPS"), hospitals are paid a set amount of money (called the payment rate) to give certain outpatient services to people with Medicare.

53.     Medicare covers emergency department visits. If a patient visits the ER but is not formally admitted to the hospital, they may be considered an outpatient under Medicare Part B.  If they are admitted, then they may be considered an inpatient under Medicare Part A.

---

[8] *See* 63 Fed. Reg. 26,252,26,259-60 (May 12, 1998).

54.     When a patient goes to a hospital's emergency department, via either an ambulance or driving themselves in or being driven in by family or friend and waiting in the waiting room, this new ED patient is initially considered an outpatient. They may still be considered an outpatient even if they stay overnight in the hospital. Outpatient emergency department visits are covered by Medicare Part B.

55.     With regard to outpatient ED costs under Medicare Part B, the individual healthcare consumer patient usually pays 20 percent of the Medicare-approved cost for doctor and other health care provider's services. The individual consumer may also have to pay a bill for a copayment from the hospital for each Medicare-covered service that they receive, such as X-rays or lab tests. Copays typically cannot exceed the $1,556 Part A deductible for each service. The Part B deductible, $233 in 2022, also applies. The consumer may not owe this if they have already met their yearly deductible before arriving at the hospital.

56.     A consumer may ask, if they are spending hours in the emergency department, how can they be an outpatient? The answer is that Medicare only provides hospital inpatient coverage after a doctor writes an order and formally admits the individual to the hospital. Typically, inpatient admission takes place when the patient is expected to need at least two nights of medically necessary hospital care. If the patient is thus admitted to the hospital, Medicare Part A covers the entire stay. The trip will be considered an inpatient stay and ER-related copays will not apply.

57.     To be eligible to submit claims to Medicare, HCA and Team Health were obligated to execute and submit one or more Medicare Enrollment Applications in which the Defendants certified, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the

Federal anti-kickback statute and Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.[9]

58.     Defendants billed Medicare-covered services using electronic or paper submissions using forms such as the Uniform Bill 04 ("UB-04") or the electronic equivalent.  These electronic forms and submissions included promises and representations with regard to the veracity and accuracy of the billing submissions and compliance with the applicable rules.

**C.     Medicaid coverage.**

59.     Medicaid is a health insurance program for low-income people jointly funded by the federal and state governments.  42 U.S.C. § 1396 *et seq.*  Both federal and state statutes and regulations apply to the state-administered Medicaid programs.  *See id.*

60.     NC Medicaid covers emergency department care, subject to conditions and limitations such as certain co-pays.[10]

61.     During the pertinent times, HCA, TH, or both, received monies from the Medicare and Medicaid programs in return for providing emergency department care to patients who are Medicare or Medicaid beneficiaries.  From time to time, Defendants certified to the accuracy of their Medicare and Medicaid reimbursement demands through forms and submissions subject to FCA and NC FCA duties.

62.     In order to qualify for Medicaid benefits, duly authorized agents of one or more of the Defendants signed or caused to be signed and submitted an NC DHHS Provider Administrative Participation Agreement, which represented:

> To submit claims for services rendered to eligible Department recipients (hereinafter "recipients") in accordance with rules and billing instructions in effect at the time the service is rendered. Provider agrees to be responsible for research

---

[9] *See* CMS Form 855A.
[10] See NC DHHS website, https://ncmedicaidplans.gov/copays.

and correction of all billing discrepancies in claims submitted by the Provider or its authorized agent....

That all claims are subject to the North Carolina False Claims Act, Chapter 1, Article 51 of the North Carolina General Statutes (N.C.G.S §§ 1-605 through 617), the federal False Claims Act, and when applicable the Medical Assistance Provider False Claims Act (Part 7, Article 2, Chapter 108A of the General Statutes)....

<u>That all claims shall be true, accurate, and complete</u> and that services billed shall be personally furnished by Provider, its employees, or persons with whom the Provider has contracted to render services, under its direction.[11]

63.     Each form CMS-1450 / UB-04 was a claim for payment presented to the United States or the State of North Carolina that related to care provided to patients at the relevant facilities for the cited periods of time. Each form included certification as follows:

THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill: ... 8. <u>For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.</u>[12]

**C.     Facts Regarding the Relators.**

64.     Dr. Ramming received his M.D. from the University of Vermont Medical School in 1994. He had his Emergency Medicine Residency at Hennepin County Hospital in Minneapolis,

---

[11] *See* NC DHHS Provider Administrative Participation Agreement, July 1, 2013, available at https://www.nctracks.nc.gov/content/public/providers/provider-enrollment/terms-and-conditions/admin-participation-rev.html (emphasis added) (last accessed Dec. 29, 2021).

[12] Page 2 of https://www.cdc.gov/wtc/pdfs/policies/ub-40-P.pdf (emphasis added) (last accessed Dec. 29, 2021).

Minnesota with a focus on emergency medicine[13] in the emergency department of a large urban hospital. Dr. Ramming is Board Certified in Emergency Medicine with the American Board of Emergency Medicine. He has been in practice for over 20 years. A copy of his CV including additional information can be provided. See also Dr. Ramming Relator Summary.

65.     From 1998 through present, Dr. Ramming has worked as an emergency medicine physician stationed at the ED of one or more of the six hospitals of the Mission hospital system in Western North Carolina. This includes the Mission Hospital Asheville ED, with approximately 94 beds.[14] In addition, Dr. Ramming from time to time has worked at the emergency departments of one or more of the five smaller regional hospitals in the system: Angel Medical Center, in Franklin NC; Blue Ridge Regional Hospital, in Spruce Pine; Highlands-Cashiers Hospital, in Highlands; Mission Hospital McDowell, in Marion; and Transylvania Regional Hospital, in Brevard.

66.     From 1994 through present, Dr. Lalor has worked as an emergency medicine physician stationed at the ED of one or more of the six hospitals of the Mission hospital system in Western North Carolina. This includes the Mission Hospital Asheville ED, with approximately 94 beds. In addition, Dr. Lalor from time to time has worked at the emergency departments of one or more of the five smaller regional hospitals in the system: Angel Medical Center, in Franklin NC; Blue Ridge Regional Hospital, in Spruce Pine; Highlands-Cashiers Hospital, in Highlands; Mission Hospital McDowell, in Marion; and Transylvania Regional Hospital, in Brevard.

---

[13] In 1989, Hennepin Healthcare was the first hospital in Minnesota verified by the American College of Surgeons as a Level I Trauma Center. The Emergency Department is the busiest in the state with more than 90,000 visits annually. Board-certified ED physicians give 24-hour coverage and outstate emergency consultation. https://www.hennepinhealthcare.org/specialty/emergency-department/.

[14] See Mission Certificate of Need application dated 5/7/19 (stating that Mission then had "the region's most sophisticated 94-bed emergency department").

67.     Both Dr. Ramming and Dr. Lalor served the community for years as emergency physicians, serving in the Asheville ER, and practicing with Carolina Mountain Emergency Medicine ("CMEM") from 1994 onward.  More recently, Dr. Ramming and Dr. Lalor were compensated by Team Health and CMEM became a Team Health entity.

68.     Originally, the Mission system was a community nonprofit.  It remained a nonprofit through early 2019, when the system was acquired by HCA.  Effective April 15, 2020, the new Mission system owner HCA then proceeded to contract with TH to staff the hospital EDs in the system.  Team Health became the company providing physician and midlevel staffing for the six EDs in the system.  Team Health calls itself "the largest physician practice in America."[15]

69.     Effective April 15, 2020, Dr. Ramming, Dr. Lalor, and other physicians and non-physician practitioners, also sometimes known as "midlevel" providers, provided patient care in the Mission emergency EDs, were parties to employment-related contracts with nonparty ECC.  ECC is owned and controlled by Team Health.

70.     Today, Team Health has an ongoing contractual arrangement to staff the HCA Mission EDs and provide physician and related staffing there.  Under this business arrangement between TH and HCA, HCA states that it pays TH a "subsidy" for its medical staffing services.[16]

---

[15] See video, "Taking on UnitedHealthcare," at https://www.youtube.com/watch?v=R0qu-R4oU1o, at approximately 24 minutes.
[16] In this regard in a Certificate of Need application dating from 2021 in connection with a proposal to supplement the Mission Hospital Asheville ED with a new, free-standing county-line ED (the "FSER"), HCA stated that "Mission Hospital expects to pay professional-related fees in the form of a subsidy to TeamHealth, the physician practice contracted to provide emergency medicine physician staffing for Mission Hospital ED and which will also be contracted to staff the FSER; the contractual fees will cover medical oversight and expenses at the FSER  not included in the professional fees for which TeaHealth will bill and collect."  (CON Application, Form F.3b projected operating costs upon project completion).

22

71.     Thus, when Team Health was brought in to provide staffing at the EDs in 2020 after HCA acquired the Mission hospital system, Relators had already been working at Mission for many years.

72.     At the time of the announcement of the HCA sale, circa the 2018-2019 time period, Dr. Ramming was not only an emergency department physician at the Mission Hospital System EDs, but also, held an assistant director position and played a leadership and a liaison role as between the emergency department staff and the medical team, on the one hand, and the "C-Suite," or business-end executives, in the organization, on the other.

73.     Because of his leadership role, Dr. Ramming was invited to a meeting that occurred during that time frame.  At that meeting, he was told that HCA was going to make the trauma requirements more lenient.  This information is consistent with a chart that was circulated several years later that showed that trauma admissions at Mission spiked and increased substantially after the date of April 15, 2020, which marked the date when TH took over the ED staffing.

74.     Specifically, during the general time window in which HCA took over the Mission Hospital system, in the 2019-20 period, Dr. Ramming recalls a meeting that was attended by Chad Patrick.  Chad Patrick is currently the Chief Executive Officer of Mission Hospital.[17]  According to public information, Patrick was appointed to Mission in July 2019, after having been the CEO of HCA Healthcare's Orange Park Medical Center in Jacksonville, FL, for six years.[18]  There has been public reporting of overcharges by Florida HCA facilities.[19]  William Shillinglaw, M.D. was

---

[17] https://missionhealth.org/member-hospitals/mission/leadership/.
[18] *Id.*
[19] *See* Tampa Bay Times, How HCA turned trauma into a money-maker: HCA trauma centers are charging injured patients tens of thousands of dollars more than Florida's other trauma centers. Dated March 9, 2014, at https://www.tampabay.com/news/health/how-hca-turned-trauma-into-a-money-maker/2169280/.

also at the meetingas were a couple of the nursing managers. The meeting was held in Mr. Patrick's office in the "C-Suite." At the meeting, it was announced that HCA-Mission was going to relax or lower the threshold for activating Code Trauma and Trauma Alerts. See Ramming Summary, ¶ 68.

75. Trauma "codes" or "alerts" are familiar to most practitioners. When there is a code trauma or a trauma alert, a number of hospital staff are notified to go to the emergency department as quickly as possible. The trauma team is activated in the emergency department prior to or at patient arrival. This leads to a trauma fee which is the price a trauma center charges when it activates and assembles a team of medical professionals that can meet a patient with potentially serious injuries in the ER. The Mission website states: "Mission Hospital is the only designated trauma center in western North Carolina (State designated Level II Trauma Center). As a designated trauma center, Mission Hospital accepts all trauma patients from the region. Regional hospital referrals are accepted by Mission's Emergency Department physicians on behalf of the Trauma Surgeons. Injured patients may also arrive via EMS or self-referral from anywhere in the region."[20]

76. After the above-referenced discussion in Mr. Patrick's office, Dr. Ramming began to notice more unnecessary Code Trauma and Trauma Alert designations in the Mission Hospital Asheville ED.

77. Over the last several years, as discussed further below and in Relators' Summaries, what Relators have witnessed includes conduct that: (a) has threatened or impinged upon the overall quality of patient care and the quality of the patient experience at the Mission Hospital Asheville ED, (b) has degraded the quality of the employment experience for the physicians and

---

[20] *Id.*

other medical professionals working at Mission; and (c) has caused overbilling of Medicare and patients. The business practices of HCA and TH at the Mission Hospital Asheville ED have led to the effects described above in the following respects:

    a. By ordering numerous unnecessary or redundant samples, tests, blood draws, urinalysis, laboratory analyses, metabolic panels, or related items (collectively "labs"), and by ordering unnecessary and/or redundant scans and x-rays, including CT scans (collectively "rads" or "scans") (collectively "labs and scans").

    b. By over-designating cases as either being "Code Trauma," "Trauma Alert," "Code Sepsis" or "Geri Trauma," when it was not necessary or justified.

    c. By using "metrics" and performance incentives and admonitions that have reduced the physician's (and others') ability to spend time with the patient and have encouraged over-triage and overbilling for labs and scans and unjustified Code Traumas.

78. In or about the 2019-20 time period when HCA and TH took over, Dr. Ramming was contacted by telephone by a corporate representative of TH who was also a physician. They discussed his role as assistant director of the Asheville ED and the representative asked for Dr. Ramming to advise him of any questions or concerns that he had. Dr. Ramming gave him an honest report of some of the problems and poor practices that had become evident with the takeover and change in operations. After that phone call, Dr. Ramming was surprised to learn that he had been unilaterally demoted from the assistant director position. He continued thereafter practicing as an ED physician but no longer held the assistant director responsibilities.

79. The takeover of the Mission Asheville ED by HCA/TH has brought with it changes in operational policies and procedures that have caused the ordering of numerous unnecessary or redundant labs, that is to say, samples, tests, blood draws, urinalysis, laboratory analyses, metabolic panels, or related items. Specific examples of unnecessary labs from recent Mission Hospital Asheville ED screen information and electronic charting are provided below and in the Ramming and Lalor Relator Summaries.

80.     These unnecessary labs are readily identifiable in hospital ED electronic charts.  It should not be difficult to identify other cases of unnecessary and redundant labs in electronic charts through an expert review.

81.     The items at issue include items routinely aggregated under the "lab" column on the electronic ED spreadsheet-style information typically seen on-screen at the Mission Asheville ED.  The prevalence of the unnecessary "add-ons" in the "lab" and "rad" (scan) columns causes extra cost items and charges to appear in the ultimate detailed billing information submitted to the Medicare/CMS payor.

82.     Changes caused by HCA and Team Health in ED operations have led to this practice of overbilling by the ordering of unnecessary labs.  The same practices are presumably occurring at other large HCA and/or TH EDs because the practices are the effects of basic structural and operational changes that HCA/TH imposed since taking over operations at Mission Hospital Asheville.  Those changes include:

    a.  Use of severely calibrated and corporate-imposed "metrics" which are measures set by Defendants and used to evaluate performance, rank physicians against each other, and establish bonuses.  A chief metric is generally speed of service.

    b.  Combined with pressuring physicians and non-physician practitioners to see patients more briefly and quickly, Defendants also encourage and instruct them to order labs and scans based on broadly generic "power plans," bundles or standard operating procedures, rather than by spending adequate time with the patient and deliberately selecting the individual labs and scans, if any, that may be needed. Healthcare workers are more likely to order unnecessary labs and scans when they are pressed for time.  HCA and TH excessively aggressively encourage the use of power plans in an improper manner.

    c.  Placing a worker in the "air traffic controller" post to order trauma alerts for incoming patients by ambulance;

    d.  Placing midlevels in posts where they interact early on with the incoming patient and are highly incentivized to order labs and scans.  A less experienced P.A. or N.P. is more likely particularly in a time-pressure, brief-interaction scenario, to order more unnecessary labs and scans than a more experienced and trained physician

may have ordered. TH intentionally places midlevels in positions where they can, and are encouraged and admonished to, order labs and scans before the patient is seen by a physician. Often, by the time a physician does see the patient, it is too late to undo the lab/scan order, or, the physician otherwise is himself put under time pressure and lacks the time to go back and delete unnecessarily ordered tests that have not yet been performed.

83.     Like the extra "labs," there are also routinely unnecessary items ordered that get included among the items routinely aggregated under the "rad" field or column on the electronic ED spreadsheet-style information. See specific examples in Ramming Relator Summary. Review by a qualified professional can verify the prevalence of this practice of over-ordering scans at the large HCA/TH ED at Mission Hospital Asheville. The practice is likely also occurring at other large HCA and/or TH EDs.

84.     When extra unnecessary labs and/or scans are ordered, and performed, and this information is reflected in the electronic chart, this necessarily increases the odds that the chart will be coded and billed at a higher and more costly CPT code than otherwise. The adding-on of labs and scans causes upcoding.

85.     The administration of repetitive and unnecessary scans also needlessly exposes patients to unnecessary and cumulative doses of radiation.

86.     In the first example provided by Dr. Ramming in his Declaration, the incoming patient had MRN (Medical Record Number) 00-02-53-71-55. (Ramming Summary ¶ 44). This was a young man who presented with a chief complaint of having consumed some energy drinks and chest pain. The photo was taken on February 21, 2022, at 21:23 EST (9:23 p.m.). The nurse/midlevel had ordered unnecessary labs and scans. The lab orders for "Metabolic Panel," "Troponin 1" and "CBC s/Diff" were unnecessary. As the image shows, Relator noticed them early enough to be able to delete them. See notation at right, "Cancelled by Provider."

87.     In the same example, the order for "DX Chest 2 Views" was for unnecessary scans. Unfortunately, by the time Dr. Ramming saw this screen, it was too late.  Whoever the payor was, they were overbilled in that respect.

88.     One effect of this over-ordering of labs and scans is to tie up resources at the ED. It reduces available time for other more needy patients.  Another effect of it is that the appearance of the additional labs and scans in the electronic chart in turn will allow coding and billing personnel to bill for the extra items as extra charges.  And another effect is that the presence of the extra items in turn may be used by coding and billing staff to apply a higher CPT code, which would also increase the patient's costs unnecessarily.

89.     Below are Dr. Ramming's specific examples, organized by date, MRN, and a brief description (See Ramming Summary ¶ 56):

| No. | Date. | MRN | Description |
|---|---|---|---|
| 1 | 2/7/22 | 600199 | The triage APC (advanced practice clinician) ordered unneeded labs, urine tests.  A few hours earlier the patient had urine and urine culture already ordered at the urgent care facility he had already gone to.  There was no need for these repeat tests, and the patient was not ill enough to get the "sepsis" bundle as suggested by the triage APC. |
| 2 | 2/7/22 | 2527990 | Here, a minor motor vehicle collision was improperly designated as a "Trauma Alert." (Relator's understanding is that this is the next level down from "Code Trauma"). The patient received an excessive workup as a result. |
| 3 | 2/7/22 | 599844 | Patient with musculoskeletal pain.  Patient received labs and a CT Scan that were both not needed. |
| 4 | 2/7/22 | 1896865 | Cystitis.  Patient received unneeded labs. |
| 5 | 2/7/22 | 2452922 | Vaginal bleeding in early pregnancy.  Unneeded labs were ordered by the TAP (Triage Advanced Practitioner). |
| 6 | 2/11/22 | 1359001 | This was a transfer from another facility for stroke symptoms.  The repeat labs ordered by the hospitalist were not needed.  The first facility had already performed tests. |

28

| 7 | 2/21/22 | 2504103 | CT face for nasal fracture. Imaging is not generally needed for broken nose. Unnecessary service leading to overcharge. |
| 8 | 2/21/22 | 195450 | Patient was asked to return for recheck after positive blood cultures. CBC and CMP ordered, IV ordered. Patient had just had these tests on the day prior, and while repeat blood cultures are possibly indicated, routine recheck of other labs is not warranted unless there is a clinical reason to suspect they would have changed.[21] |
| 9 | 2/21/22 | 964345 | Labs and CT face ordered for sore throat. The patient had exam suggestive of uncomplicated strep throat. The labs and the scan were unnecessary. |
| 10 | 2/21/22 | 636233 | Labs ordered for uncomplicated nosebleed. Labs are not needed for uncomplicated nose bleeds. |
| 11 | 2/21/22 | 2233134 | Labs ordered for uncomplicated nosebleed again. |
| 12 | 2/21/22 | 1749202 | Labs and CXR ordered for "ozone exposure." This patient had normal vital signs and labs and an x-ray would not be useful at all. |
| 13 | 2/21/22 | 498334 | "Code sepsis" ordered for a non-septic patient. Dr. Ramming will state that it is very common for the Triage Advanced Practitioners to overcall "code sepsis cases." HCA/TH benefit from this practice in two ways: financial from increased billing/charges, and also because if many "non-septic" patients are pooled with truly sick populations, the overall mortality rate will be lower. |
| 14[22] | 2/21/22 | 2537155 | Labs, CXR, oxygen and IV ordered for patient with "jitters" after drinking energy drinks. This is a great example for illustrating how extreme HCA Mission has become in over-ordering tests where even a layperson with common sense could explain this patient's jitteriness. Dr. Ramming would further testify that all of the 2/21/22 cases presented during his eight-hour evening shift. All of the unnecessary testing was ordered by Physician Assistants (PAs) who were stationed at triage. In the triage area, the PAs have only a very limited ability to interview the patient, really examine the patient or spend time[23] with the patient so as to determine what is really wrong with the patient. |

---

[21] The fair market value of these labs is low. The markup is immense by HCA. There are thus two issues: a) over-ordering, and b) over-charging.

[22] This is same patient as discussed above herein.

[23] Dr. Li will testify that the time limit is key. Even with excellent training, ED physicians are pressured to do things that are impossible without adequate time to develop a rapport or even think critically.

| 15 | 3/5/22 | 472836 | A 91-year-old female presented with a very minor head injury; arrived by car driven by family member/friend; felt woozy. She had also come to the ED the day before but left due to the long wait. The patient was on Eliquis. The patient was given a geriatric "Trauma Alert" designation which was unwarranted. |
|----|--------|--------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 16 | 3/5/22 | 771066 | Patient was transferred from an outside hospital for admission at Asheville ED. Patient had labs in the other hospital's ED before being transferred. Repeat labs were ordered and were unneeded. |
| 17 | 3/5/22 | 914691 | Patient with SVT. Had labs ordered that were not needed. |
| 18 | 3/5/22 | 476385 | This was a geriatric head injury case sent from the Blue Ridge ED (Blue Ridge is one of the five smaller satellite hospitals in the HCA Mission system). The patient was transferred and admitted to the Asheville ED for a minor head injury. He was improperly designated as a geriatric "Trauma Alert." |
| 19 | 3/7/22 | 962279 | Case involved an 18-year-old male with bladder symptoms. He had labs ordered at triage for CBC and CMP that were not needed. |
| 20 | 3/7/22 | 366762 | This was a 43-year-old male with flank pain. He was given CT Scan, labs and IV medications that were not needed. He had a known history of kidney stones. |
| 21 | 3/7/22 | 2487788 | This was a patient with known a-fib/flutter. Patient had unnecessary labs ordered. |
| 22 | 3/7/22 | 2354915 | For this patient, labs had already been performed earlier in the day. Yet there were unnecessary labs reordered by the Mission Asheville ED. |

90.     Below are additional examples of unnecessary trauma activations, excerpted from notes kept by Dr. Ramming, and with MRNs in boldface:

**MRN 2542355** -- I saw this patient on 4/7[/22] at Highlands ER. The patient had fallen off a ladder 3/24, and was seen on that date as well. I diagnosed a severe L3 vertebral compression fracture with spinal canal compromise; this injury was a result of the fall on 3/24, but was not apparent at the time of the first ER visit. The patient had been quite active and was perfectly able to walk since the time of injury. He had no neurological deficit from his injury. He did need urgent spine surgery consultation and surgery, so I discussed this with the specialist on call at Mission

Hospital [Asheville], and they recommended transfer[24] for the required care. Since the patient had been ambulatory since his fall, I felt that transfer by his own car was reasonable. The patient agreed, and his wife drove him to Asheville. When he arrived to the ER he was given a trauma alert designation, maybe because he had a spine fracture? In any case, it was completely unnecessary, as even a casual layperson could probably detect, since he had no neurological deficit, and since he was ambulatory for 2 weeks....

**MRN 2537767** -- This patient arrived to Mission ED 5/12 The prearrival note in the system says:

"82 yo male having seizures, currently alert slightly agitated. Ativan on board. HR 98, 94% room air, 164/103, history of A.Fib, respiratory rate normal.

Geri Trauma was activated at 08:25 due to new information from EMS that he is on blood thinner and has an abrasion to the head"

This is one example of innumerable instances where geriatric patients are given unnecessary trauma designations for absurdly minor injuries, when the more rational approach would be to medically evaluate the patient and determine what the problem is, rather than mobilizing unnecessary resources. As is so often the case, in instances like this, this patient was actually medically sick and had no traumatic injuries. These cases often get medically admitted (as opposed to trauma service) or go home. They automatically get top priority for their medical care (bumping many much more ill patients back in order to be seen) jeopardizing outcomes for other cases in the waiting room and ED in general. These cases (as already suggested) suck up resources (respiratory therapy, xray staff, multiple nurses, techs, doctor/providers etc.) that are desperately needed for care of other patients in the department. These cases very frequently get unnecessary testing as a result of exuberant testing that is often automatically ordered because of the trauma designation. Note that all trauma designations are given a nursing triage category of at least 2…even if the patient has no complaints whatsoever for EMS (see example on 4/27 below…)

On the date of this patient's ED visit, the waiting room had over 40 patients waiting to be seen, some for more than 5 hours....

---

[24] Regarding transfers: Dr. Li will testify as to problems he has experienced, in his capacity as ED Chief at Cherokee Hospital, with HCA Mission declining transfers for anything that is not "Trauma, Stroke, or STEMI". As these patients are the most lucrative and the hospital must accept them to keep their lucrative certifications, it appears that HCA actively disincentivizes incoming transfers aside from Trauma, Stroke or STEMI. While at Cherokee Hospital. Dr. Li has on one or more occasions found himself in a scenario where he had a very ill patient who he could not transfer from a small hospital (Cherokee) because they did not fit into the "Trauma, Stroke, or STEMI" designation. See Dr. Li Expert Summary.

**MRN 856358** -- 5/9. Similar situation to last case… pre arrival information describes a medically ill patient, allegedly with a "hematoma" over the left eye. Was designated Code Trauma. There was no true facial hematoma, the patient had no significant injury, but did have medical and psychiatric issues leading to ED visit.

**MRN 1802725** – 71-year-old patient transferred to Mission from another ED where she had extensive CT scanning after falling from a horse. In other words, the full extent of her injuries was known…. In any case, patient gets a trauma designation, despite being stable. She was stable for hours before arrival to Mission. Still, because she is a trauma designation, she gets top priority on a very busy day. Her injuries did not require any urgent intervention.

**MRN 2537444** -- 4/27. 83-year-old female fell from bed. Was called Code Trauma. Prearrival report said:

"83 yo female had a fall from bed. Heart rate 78, 103/76, respiratory rate 21, 95% room air. GCS 15, patient takes Eliquis. Laceration to right ear, large bruise and knot on upper part of her femur. Bruising forming on head as well."

This patient had no dangerous injuries and was discharged home. Code Trauma activations are supposed to be the sickest of the sick, and discharge from the ER should be rare. In our institution, with our overcalls, discharge home is common after being designated trauma alert or code trauma.

On 5/9, during a very busy shift, I commented on the fact that I was seeing many medically ill patients getting trauma designations, and also on the fact that so many of them ended up going home. The trauma PA on duty's response was "trauma overcalls aren't a problem for corporate medicine."

4/27. Typical prearrival report on geriatric Trauma Alert case:

"82 y.o. Male from Lowe's fell backwards striking the back of his head. Contusion to the back of the head. No memory of fall, remembers picking up a heavy bag. Alert and oriented x4, GCS15. Patient takes Eliquis. 169/73, heart rate 74, 95% room air. No complaints, no injuries or pain"

Despite that information, is called a Trauma Alert….

**MRN 2450973** -- 4/25. Case I saw at Highlands: 85 yo with cat scratches on her legs. Her vital signs triggered a "sepsis alert," which can generate laboratory testing and costly treatments that are unnecessary and sometimes downright harmful that are not indicated. Labs are not needed for cat scratches, needless to say. In this case, I was able to intervene and cancel the automatically generated tests, but at Mission, where patients can be in waiting room for hours, I usually am not able to do this.

4/18. Another typical Trauma Alert overtriage:

"79 year old male was a restrained occupant /driver of a vehicle that went over a guardrail and found on its side. Patient was extricated from vehicle. He was initially confused and cbg found to be 40 mg/dl. No airbag deployment. D50 given and he is now A/O x 4, GCS 15, no current complaints No injuries mentioned. 189/92, 72 HR, 98%, 20 gu IV in wrist."

(Ramming Summary ¶ 82).

91.    The second Relator herein, Dr. Lalor, was the source of many of the key documents herein with regard to service line meeting minutes and other communications. Dr. Lalor otherwise in his Summary materially strengthens, corroborates, and adds to the material facts.

92.    For example, Dr. Lalor will testify to a recent occasion where a patient came to him in the Mission Hospital Asheville ED. (Lalor Relator Summary ¶ 41). Dr. Lalor observed that a CT Scan was unnecessary in that patient's case, which was a good thing for the patient. However, the patient then advised Dr. Lalor that a CT Scan had already been both ordered, and performed – this all happening, *before* Dr. Lalor, the responsible physician, had even met with the patient. This example encapsulates the manner in which the HCA/ TH system is optimized and manipulated toward causing wasteful and unnecessary packing and stuffing of the patient's ER chart, and ER bill, with extra add-ons in the forms of labs and scans. *See* Dr. Lalor Summary. Furthermore, there is meaningful data that all else being equal, medically unnecessary CT scans and X-Rays should be avoided because otherwise the patient is exposed to additive levels of radiation. *See id.*

93.    Dr. Lalor regularly received and retained copies of voluminous email communications from HCA and TH. These included "Service Line Meeting Minutes," consisting of memos often with bullet points that purported to summarize news and instructions from TH. Dr. Ramming is also routinely copied on many of these communications. Various of these

documents are cited, excerpted and discussed in both Relator Summaries. The original source of most of said documents was Dr. Lalor.

94.     In one example from the materials retained by Dr. Lalor, with regard to the geriatric Trauma Alerts, in the service line minutes there is an instruction that a patient is to receive a trauma code where the patient is geriatric and has a "fall from any height on blood thinner (even ASA [Aspirin]) with signs of head trauma." (Lalor Summary ¶ 13 & Ex. 1). This instruction is overinclusive and too broad particularly in the context operationally controlled by TH and HCA as described. Each time such executive manipulation of medical treatment in the form of an unnecessary trauma designation gets made, it consumes unnecessary staff time and resources, and leads to upcoding and overbilling.

95.     The HCA satellite hospitals (McDowell, Angel, etc.), are on the same computer system as Mission Asheville. There is no reason why steps could not be taken to avoid re-orderings of labs and scans that were previously already done at one of the five satellite hospital EDs, before the patient is transferred to the Asheville ED.

96.     In three out of the four Code Trauma examples provided by Dr. Ramming, the Code Trauma designation was unnecessary. (Ramming Summary ¶ 63).

97.     In the examples Dr. Ramming provides, the screen reflects four Code Traumas on the screen at the same time during one shift. The following entries reflect Code Trauma designations: CTALASKA; CTIDAHO; CTMASSACHUSETTS; and CTWASHINGTON, with the capital letters CT representing "Code Trauma" and the rest a generic designator. (Ramming Disc. ¶ 62). Three of the four cases had no necessary basis for the Code Trauma designation: CTIDAHO, ONE; CTMASSACHUSETTS; CTWASHINGTON. (Ramming Disc. ¶ 63). The remaining case, i.e., CTALASKA, was a serious motor vehicle accident, involving a patient who

was admitted. By contrast, the other three Code Trauma designations should not have been so designated. The Code Trauma designation on information and belief translated into a higher CPT code designation in the coding and billing of then claim.

98. A Code Trauma or Trauma Alert designation in the electronic medical chart for any given patient translates into the matter being billed out at a higher CPT Code or otherwise for a greater monetary amount compared to patients who do not get the Code Trauma moniker; each such Code Trauma or Trauma Alert designation causes a corresponding price increase to the payor generally.[25]

99. It should not be required to individually have an expert inspect every patient chart and electronic data to determine that there was chronic overbilling. Rather, a representative sample group could be consulted and should allow substantiation of an unacceptably high rate of upcoding and overbilling causing false claims to Medicare. It is logical to conclude that by analysis of a sample group, broader conditions may be inferred, since the ED itself as well as the billing and coding are intentionally run under routinized and generic policies and procedures imposed by Defendants on "service line" healthcare workers.

100. These generic policies include periodic statements made in the "Service Line Meeting" minutes, which are emailed summaries, containing bullet point style information. On

---

[25] "The code used for trauma activation with critical care is G0390." See generally website information found at https://vitalware.com. In North Carolina, a survey found that the average HCA fee for trauma activation was $9,187, while the average non-HCA fee was only $5,175. https://www.beckershospitalreview.com/finance/how-hca-s-trauma-activation-fees-compare-across-14-states.html. *See also* Kaiser Health News study findings summarized at KHN website, article authored by Jay Hancock, June 14, 2021, entitled "In Alleged Health Care 'Money Grab,' Nation's Largest Hospital Chain Cashes In on Trauma Centers," https://khn.org/news/article/in-alleged-health-care-money-grab-nations-largest-hospital-chain-cashes-in-on-trauma-centers/.

information and belief, the content in these minutes includes information formulated and disseminated from the TH corporate office.

101.    These have included, for example, a mandate to use "CODE TRAUMA" based on grossly oversimplified criteria: "Anyone over 65 or older with a systolic blood pressure of 110 or less is a CODE TRAUMA; anyone with a GCS less than 13 is a CODE TRAUMA…." (Lalor Summary ¶ 23 & Ex. 1).

102.    In fact, it is not the case that "anyone over 65 or older with a systolic blood pressure of 110 or less" should be a CODE TRAUMA. The criteria are far too crude and overinclusive.

103.    Nor should "anyone with a GCS less than 13, regardless of alcohol intoxication" be a CODE TRAUMA. That is far too broad and overinclusive, as well.[26]

104.    In another email dated January 30, 2021, TH repeated the same criteria: "Reminder: Systolic B[P] <110 in patients 65 or older is code trauma criteria. This is ev[e]n on one isolated BP." "Reminder: GCS 13 or less is code trauma criteria. This incl[u]des if from etoh." (Lalor Summary ¶ 26).[27]

---

[26] Per Dr. Li: Grossly oversimplified is important. GCS <13 can easily be an intoxicated person who is a little confused, plus the assessments in the field by EMTs are often inaccurate (Dr. Li has experience as an EMT and an associate EMS medical director with prehospital experience as a physician as well as the medical director of a SWAT team). GCS<8 would be a much more broadly accepted criterion, recognized by the common moniker "GCS <8, Intubate" -- the rule of thumb that this is the point where a breathing tube is needed. Further, GCS is validated in trauma. But it is often inappropriately applied to medical patients (patients with delirium, sepsis, drugs), especially if a code trauma is called by a non-physician resulting in diagnostic momentum and inertia, mis-applying GCS in a medical case. SBP of 110 is indefensible. This can be a very normal finding. <90 would be fairly reasonable cut-off for concern.

[27] Dr. Li opines: This is indefensible. Singular BP measurements are notoriously useless and inaccurate. Trends are what is important and any reasonable physician will attest to this. A singular reading at 70 SBP may simply be the wrong sized cuff or another error. A BP of 170 --> 140 --> 120 --> 105 might be concerning and Dr. Li would watch this (but even it is still not an indication for a code trauma). If a patient presented with a BP of 100-110 most of us would call this "soft" and want to repeat it to make sure that it was not decreasing, as well as see if the patient has past BPs in the chart to see what is typical for them.

105.     These instructions to designate code trauma at a moment's notice are consistent with the chart cited in Dr. Ramming's Summary, which shows a higher and more lucrative trauma volume at TH at HCA Mission, after HCA/TH took over, when there has been no cohort acuity change to support such a total change.  (Ramming Summary ¶ 79).

106.     After April 15, 2020, which was the date that Team Health came into the Asheville ED, the number of trauma activations surged.  There were substantially higher numbers through the end of 2020, then going to even higher numbers in 2021.

107.     And yet, the overall patient mix and patient acuity level did not change during that time in such a manner as would account for the change.  As physicians who regularly practiced in the Asheville ED for years before the 2019-20 changeover to HCA/TH, and who continued to practice thereafter, neither Relator witnessed any shift in patient acuity such as would justify the striking change in trauma activations volume.

108.     Prior to 2019-20, the process for transfers from other hospitals to Mission Hospital Asheville involved physicians typically contacting each other from the different hospitals involved and making a joint decision upon whether to transfer a given patient.  If a transfer to Mission Hospital Asheville was warranted, then the patient would typically be admitted to an Asheville iNpatient bed.

109.     However, after HCA/TH took over, transfers now are directed to a "transfer center" to decide.  Furthermore, no physician can subsequently revoke that decision.  Further, all patients are now, when transferred into Mission Hospital Asheville, routed specifically to the Asheville ED.  That step triggers ED billing and charges that ordinarily would not accrue.  It also places a burden on the ED staff since patients are being bottlenecked there.

110.    These operational changes have encouraged overcrowding of the Mission Hospital Asheville ED, with excessive individual patient wait times and lack of adequate time for staff to see patients.   The overcrowding has further encouraged overuse of labs and scans because practitioners are not given the time, setting or support that they need to methodically and responsibly triage and order those that are actually medically needed.

111.    The changes imposed since HCA/TH arrived have forced physicians, midlevels and nurses alike into adopting a conveyer-belt, fast-food approach to emergency medicine, which is counterproductive both for their experience as employees, and for the experience of the patients.

112.    Since HCA and Team Health have taken over, there has been an increased focus on performance metrics and the use of ratings systems that have had a demeaning and humiliating effect on physicians and other professionals.[28]   Workers are rated against each other as to various measures of performance that Defendants set, and that are less optimized for quality of the patient care or of the employee experience and more optimized for financial return and revenues and costs savings contributing to profits.   In that regard, since its takeover of the Mission hospital system, HCA touts it as number two out 50-plus hospitals in the HCA system nationwide in terms of revenues and profitability.[29] From an ethical doctor's perspective this profitability has come at an

---

[28] These "performance" metrics may not even correlate with quality. Another metric is patient satisfaction, typically measured by Press-Ganey Scores. The scores are generally affected by dynamics outside of the physicians' control.  Further, the surveys are sent only to patients who are not admitted. And those who do not die. In other words, the patients who likely needed emergency services the most or were using the ED appropriately do not weigh in.   Further, studies indicate that higher patient satisfaction scores actually correlate with increased mortality. Patients may think they want one thing -- and increased testing, increased medications, labs, imaging may increase "satisfaction" in the short term but may be detrimental to their health. Therefore, a heavy emphasis on patient satisfaction scores incentivizes physicians and non-physician practitioners to over-order labs and imaging, further over-billing Medicare while potentially causing medical harm to the patient.

[29] https://www.definitivehc.com/blog/top-hca-hospitals-nationwide.

intolerable cost in terms of overall quality both of the patient care and the quality of the workplace environment for the medical professionals, and at a cost of tremendously wasteful and fraudulent overbilling and overcharging both of the Medicare program and patients themselves.

113.    A common metric used by Defendants measures time that it takes from what is measured as a starting point of the emergency department visit (such as, the time when the patient arrives at the Mission Hospital Asheville ED), to the time that the patient is discharged (such as, the patient either is discharged and leaves the hospital and goes back home, or, the patient finishes with the ED part of his visit and is admitted and transferred now to another part of the Mission Hospital Asheville building complex and to an inpatient bed).

114.    While reducing physician time per patient helps TH reduce labor costs and increase charges, it very often does not serve to benefit the patient.  Further, the incessant pressure to speed up interactions degrades the work environment and creates anxiety and stress among the team members and medical professionals who are involved.  In service line meetings and elsewhere, TH has aggressively deployed metrics and performance incentives and admonitions that have had the effect of reducing the amount of time that the physicians have to spend with the patient.

115.    An excerpt from the service line meeting minutes dated May 19, 2021 bemoans how "[w]e are often missing the metric" because of a sentiment that "it may be overkill to fire [i.e., use] ED (Adult) Sepsis powerplan." (Lalor Summary ¶ 39).  The "metric" connects to the humiliating relative ranking system that treats doctors like salesmen.  The overused "Sepsis powerplan" causes overbilling of the government payer because it includes care/service item that are often not needed for the patient.

116.    Attached to Dr. Lalor's Declaration is an example of an email transmitting the Service Line Meeting notes from Nov. 19, 2020 that reflects the dual involvement of both HCA and TH in relevant matters and communications. (Lalor Summary Ex. 1).

117.    TH has elsewhere repeatedly admonished medical staff in the service line meeting minutes to use various "order sets" and "powerplans":

"Sepsis:  Please use the order set, HR > 90 bpm, RR > 20, Bili > 2, AKI.
-   Don't feel bad about activating the ED (Adult) Sepsis orderset even if you are nursing short staffed because this will further highlight the staffing shortages, and we just have to do what is right for the patient
-   Elderly confused/weak:  make more of these code sepsis since you know that they will likely have an underlying UTI and a slight bump in the lactate and or Cr or bili put them in the sepsis category."

(Lalor Summary Ex. 1).

"Sepsis
-   Continue to use plan, even if you are late to the game of diagnosing sepsis; even if metric is missed, it's an average, not an absolute."

(*Id.*).

"Sepsis
-   Have a low threshold for using the plan"

(*Id.*).

"New Sepsis Pager for TeamLead to carry when antibiotics are ready for sepsis; please continue to use ED (Adult) Sepsis plan to order labs/imaging and antibiotics."

(*Id.* Ex. 1).

"Sepsis
-   Just do it ie fire the plan and order abx
-   Use the plan no ala carte – the plan gets the abx ordered."

(*Id.*).

118.    TH has repeatedly admonished medical staff in the service line meeting minutes to meet the length-of-stay metric, even when the ED is overwhelmed and busy:

"DC LOS
-Thank you for continuing to work on this, particularly on slow days.
-It is understandable when we are overwhelmed and busy; please continue to do your best and be as efficient as you can; please escalate to NUS if need be…."

(Lalor Summary Ex. 1).

"Mission – group metric to get Arrival to DC order under 160 min average."

(Nov. 3, 2021 email, Lalor Summary Ex. 1).

119.     Further, TH has tied the trigger events used to time certain performance metrics, to the moment when the initial midlevel first orders labs or scans.  This linkage creates an additional incentive for the non-physician practitioner to quickly order unnecessary labs or scans or miscellaneous unnecessary charges for EKGs or medications, because by doing that they will stop the metrics clock:

"Greet to first clinical orders
-    What counts Labs, ECGs, Xrays, Meds, EKG
-    What doesn't count"

(Nov. 18, 2020 service line minutes, attached as part of Lalor Summary Ex. 1).

120.     In another excerpt from the service line meeting minutes, once again TH pushes the staff to use the sepsis powerplan.  Furthermore we read: **Don't verbalize that you are using the plan to get stuff done; finally meeting metrics**."  (Lalor Summary ¶ 45, emphasis added).  This statement appears to reflect TH instructing the staff expressly to not say something, to actively take steps to conceal, from patients and others, the fact that staff are using the plan to meet their metrics (and thus get their bonus).  In fact, it is common knowledge among staff that extra admissions, transfers, code traumas, trauma alerts, code sepsis, and other inflated and improper codes are being regularly used by the TH system and the prime mover behind this change is TH.

121.     The above excerpt also instructs, "Don't cancel things later in the plan."  The reason given is because that will cause "missing that metric."  However, the rationale that should drive

41

patient care is what is good for the patient, not what satisfied the metric to placate Team Health or get a bonus. Furthermore, in providing an emergency department medical service to a twenty-first century American health care consumer, entities, particularly for-profit companies like HCA and TH, should be fairly obligated to provide fair and reasonable auditing, coding and billing, not only vis-à-vis CMS and Medicare, but also via-a-vis the consumer, without excessive padding of bills by unnecessary orders for samples, laboratory tests or analyses, x-rays or CT scans, medications or other items, all for a healthcare consumer's emergency department visit. While Team Health and/or HCA state that they do not promote out of network billing or "balance billing," it is plain that the companies do overbill government and other payors.

122.    The metrics imposed by HCA and Team Health are manipulative and oppressive. Again, they place a priority on how fast you can see the patient. You are awarded if you have an average lower time per patient from when they come in the door to when they go out again. Those who have lower times are ranked higher, while those who take longer get ranked lower. Everybody gets to see each other's scores, and it is a zero-sum game, meaning, that out of any current group of doctors (or others) in the workforce for the emergency department, one will always be the highest, and one will always be the lowest. Even if the overall time average for the hospital as a whole is better than at other hospitals – there will still be a bottommost, number 20 out of 20, "worst place" or "lowest performing" doctor. This publicizing of such metrics and rankings to all the workforce in the relevant section of the hospital is humiliating, dehumanizing, and manipulative by the company. And it is based on measurements and metrics made and chosen by Team Health, not by the treating doctors. This is frankly an unfair and demeaning situation.

123.    These facts constitute one of the obvious drivers behind the substantial numbers of physicians who have left the Mission Hospital system since it was taken over by HCA and Team

Health. The public news reporting has documented some of this exodus by physicians, and other medical professionals have left too.[30]

124. A copy of the "June 2020 Service Line Meeting" notes is attached to the Lalor Summary as part of Exhibit 1. These meeting minutes or meeting summary include a section labeled, "Productivity." That section states:

> "Productivity – STEMI, Strokes, Geri Trauma, Psych Patient
>   o   Please be sure to see these patients even if the Cardiologist or Neurologist or Traumatologist is already present.
>   o   We need to own this territory.
>   o   We add value
>   o   These can be efficient ways to increase/maintain your productivity for a shift."

125. The plain intent of the language quoted above is to encourage the ED physician (employed by Team Health) to also see the same patients who are already being seen by and in the hands of a very qualified and capable cardiologist, or neurologist, or traumatologist, even if it's not necessary – because this allows the medical records to show that two different doctors saw the patient, which means a higher charge.

126. Statements like, "We need to own this territory," should be in the province of salesmen, not of emergency department medical professionals who are there to provide care for patients.

---

[30] *See* Ayla Ellison, Becker's Hospital Review, How many physicians have exited Mission since HCA took over? Watchdog says 200+, March 25, 2022, available at https://www.beckershospitalreview.com/hospital-physician-relationships/how-many-physicians-have-exited-mission-since-hca-took-over-watchdog-says-200.html#:~:text=Asheville%20Watchdog%20says%20at%20least,Mission%20Health%20in%20February%202019 (last accessed 3/30/22). *See also* Barbara Durr and Sally Kestin, March 23, 2022, How Many Doctors Have Left Mission? HCA Won't Say, Watchdog counts 223 departures since takeover in 2019, available at https://avlwatchdog.org/how-many-doctors-have-left-mission-hca-wont-say/ (last accessed 3/30/22).

127.    Prior to the advent of HCA and TH circa 2019-20, both Relators practiced with a small local medical group, which was a partnership/professional association. The physician members of the practice group owned and controlled it. These were all local physicians and they did not seek to use that local practice entity to encourage or mandate waste and overbilling. Nor was their local practice group dominated or controlled by any outside third party.

128.    Today, however, the local practice group of which Dr. Ramming and Dr. Lalor are members is not an entity that the local doctors own or control. Rather, it is affiliated with TH, and TH has sought to impose its will and to make policy and operational changes as discussed herein.

129.    Reviewing the generic language of the form agreement each physician had to execute in order to continue working in the Asheville ED, it includes the following language:

> "Professional shall exercise Professional's independent professional medical judgment in the performance of Professional's Services and <u>Company does not exercise any control or direction over the methods or manner by which Professional performs Services at Facilities.</u>"

130.    The underlined statement is demonstrably false to the extent it purports to state or imply that Team Health does not exercise clear control and direction over the methods and manner in which the medical professionals perform their work and provide their professional services in various relevant respects. In fact, TH <u>does</u> exercise control or direction over the methods or manner by which the providers perform their services, as extensively shown herein.

131.    For example, the coding and billing is solely done by Team Health in a "closed books" system. The individual treating doctors and nurses and other staff do not see the coding and billing. They have no say in how their services are being coded and billed. It is evident that Team Health's coding and billing division, known as HCFS, has engaged in overbilling, as is documented by other legal proceedings. The dominance over the practice of coding and billing by

44

unethical pressures from a medical necessity perspective constitutes the "corporate practice of medicine."

132. Furthermore, TH controls what "shifts" physicians can work by a variety of measures. From time to time, physicians will post requests to trade shifts. That happens on average every other day. TH manages the scheduling of physicians. (See May 11, 2021 email, Lalor Summary Ex. 1).

133. The truth is that working either as a Form W-2 "employee" or as a Form 1099 "contractor" represent interchangeable roles. Dr. Ramming knows this from personal experience. In 2020-21, in order to facilitate the changeover to Team Health while maintaining insurance, he agreed to spend a year classified as an "employee" and not a "contractor." It was just a change in format. His duties were the same either way. (Ramming Summary).

134. There are numerous quality physicians in the Team Health network. However they are trapped in a system that exploits them in the following ways material hereto:

    a. Labeling patient charts as "code trauma" when they should not be;

    b. Labeling patient charts as "trauma alert" when they should not be;

    c. Labeling patient charts as "code sepsis" when they should not be;

    d. Labeling patient charts as "geri trauma" when they should not be;

    e. Labeling patient charts as getting powerplans when they should not be;

    f. Having in practical terms unsupervised non-physician practitioners perform purported EMTALA medical screening examinations which may be unreliable under the circumstances;

    g. Causing the ordering of medically unnecessary and wasteful labs and scans;

    h. Causing incurring of expenses for medically unnecessary and wasteful other items;

    i.   Denying transfer requests for requests that do not qualify as falling within the "STEMI Stroke Trauma" matrix;

    j.   Duplicating labs and scans as between a) the originating ED and b) the transferee HCA Mission Asheville ED;

    k.   Causing degradation of aspects of work conditions at the physical premises of the HCA Mission Hospital Asheville facility;

    l.   Causing demoralization among physician and non-physician practitioners at the HCA Mission Hospital Asheville facility.

## VI.   CLAIMS FOR RELIEF.

### A.   Count I: FCA.

135.   Relators incorporate the preceding paragraphs 1 through 134 by reference.

136.   The FCA imposes liability on anyone who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. *See* 31 U.S.C. § 3729(a)(1)(A).

137.   During the pertinent times, Defendants made false statements and engaged in a fraudulent course of conduct, acting with scienter, and these material misrepresentations caused the government to pay out money or forfeit monies due.

138.   During the pertinent times, Defendants knowingly made false statements in claims for reimbursement submitted to Government-funded health insurance programs, seeking reimbursement that exceeded the amounts to which Defendants were entitled, for ED items and services which were redundant, unnecessary, wasteful, and not supported by the chart documentation.

139.   The billing for the care provided by the HCA and TH Defendants to Medicare in connection with the above-alleged specific examples of patients was improper.

140.    The Medicare/Medicaid claim information and medical charts for numerous other patients who likewise were served at the Asheville ED facility will reveal the same overbilling patterns as those shown above for the specific examples.

141.    The TH medical staff at the Asheville ED facility was poorly paid, understaffed, overworked and intentionally kept uninformed by corporate management as to their obligations imposed by Medicare and Medicaid. No one from corporate instructed facility-level staff at any time to report to the corporate office billing personnel when patients were receiving, for example, excessive labs or scans, or code trauma designations, nor were ED practices appropriately overseen, controlled or audited.

142.    The local physicians and non-physician practitioners staffing the Asheville ED did not have the ability to submit claims to Medicare, Medicaid or other third-party payers. Billing was closely controlled by the Tennessee central corporate office of TH and coding and billing activities were concealed from Relators.

143.    The Asheville ED facility operated under common, centrally controlled management practices, policies and procedures that were and are also used at some or all of the numerous other emergency departments owned and controlled by HCA or whose staffing is provided by TH. The facts reflect a pattern and practice which on information and belief occurred at other relevant ED facilities.

144.    Defendants made certifications and agreements to submit accurate and truthful requests for reimbursement at the time that they applied for permission to participate in the Medicare and Medicaid programs.

145.    In each relevant Form UB-04, Defendants in seeking payment from the government falsely certified compliance with relevant Medicare/Medicaid laws, rules, or regulations each time a claim was submitted.  These certifications were a prerequisite to obtaining a government benefit.

146.    During the pertinent times, Defendants engaged in a practice of "upcoding" in their submissions for reimbursement to Medicaid.

147.    During the pertinent times, the Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A).

148.    The Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(B).

149.    The submission of these false claims caused the United States to pay out monies that it would not have paid if it had known of the falsity of these claims.  Each false or fraudulent claim submitted to the United States is a separate violation of the FCA.

150.    Defendants are jointly and severally liable even if only one of them signed the Provider Participation Agreement or the copies of Form UB-04.  Where one party files a false claim or certification, another party can be causally involved and therefore liable when the latter party's scheme was a substantial factor in bringing about the false filings. Moreover, a defendant may be liable under the FCA if it implements a policy that causes others to present false claims.[31]

---

[31] *See United States v. Exec. Health Res., Inc.,* 196 F. Supp. 3d 477, 495 (E.D. Pa. 2016) (quoting *U.S. ex rel. Schmidt v. Zimmer. Inc.,* 386 F.3d 235, 244 (3d Cir. 2004)); *United States v. Teeven,* 862 F. Supp. 1200, 1223 (D. Del. 1992).

151.     During the pertinent times, Defendants set and implemented policies that caused the submission of the false claims regardless of whether they were only submitted under the name of nonparty ECC or some other practice group entity name.

152.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties for each violation, as well as any recoverable costs and other relief.

**B.     Count 2:  NC FCA.**

153.     Relators incorporate the preceding paragraphs 1 through 152 by reference.

154.     Pursuant to N.C.G.S. § 1-607(a), Defendants have committed acts rendering them liable to the State for three times the amount of damages that the State sustained for each violation, because Defendants knowingly presented or caused to be presented a series of false or fraudulent claims for payment or approval.  During the pertinent times, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

155.     Pursuant to N.C.G.S. § 1-607(a)(3), Defendants are jointly and severally liable for conspiring to commit a violation of one or more of subsections (1), (2), (4), (5), (6), or (7) of the statute.

156.     During the pertinent times, Defendants knowingly made, used, or caused to be made or used, a series of false records or statements material to an obligation to pay or transmit money or property to the State, and/or, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

157.     Under N.C.G.S. § 1-608(b), Relators are authorized bring a civil action for a violation of G.S. 1-607, as Relator has complied with all statutory requirements for suit.

158.     Defendants violated N.C.G.S. § 1-607(a)(1) by knowingly presenting or causing to be presented false or fraudulent claims for payment or approval to the State.

159.     Defendants violated N.C.G.S. § 1-607(a)(2) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim to the State.

160.     Defendants violated N.C.G.S. § 1-607(a) by conspiring to commit a violation of subsections (1), (2) or (4) of the statute.

161.     As a result of Defendants' violations of the NC FCA, they are under N.C.G.S. § 1-607(a) liable to the State for three times the amount of damages that the State sustained; for the costs of a civil action brought to recover any of those penalties or damages; and for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as may be adjusted by Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, P.L. 101-410, as amended, for each violation.

## VII.    PRAYER FOR RELIEF.

WHEREFORE, Relators on behalf of the United States and State of North Carolina prays that this Court enter judgment in Relators' favor and on the behalf of the United States and State of North Carolina against Defendants as follows:

1. On the First Count under the FCA, for the amount of the United States' damages, trebled, such civil penalties as are allowed by law, for costs pursuant to 31 U.S.C. § 3729(a)(3), for an award to Relators in the maximum amount permitted under 31 U.S.C. § 3730(d) and for the reasonable attorneys' fees and costs she incurred in prosecuting this action together with all such further relief as may be just and proper;

2. On the Second Count under the NC FCA, for the amount of the State's damages, trebled, such civil penalties as are required by law, for all costs, expenses and attorney fees allowed under N.C.G.S. § 1-610 to the Relators, together with all such further relief as may be just and proper;

3. for pre- and post-judgment interest at the rates permitted by law; and

50

4. for all other relief as may be required or authorized by law and in the interests of justice.

## VIII.   JURY DEMAND.

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators request a trial by jury of all claims so triable.

Dated:  June 21, 2022.

s/Mona Lisa Wallace
Mona Lisa Wallace
N.C. State Bar #9021
John Hughes
N.C. State Bar #22126
Wallace & Graham, PA
525 N. Main Street
Salisbury, North Carolina 28144
Phone: (704) 633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com
